May it please the court. I'm Robert Muse from the Thomas Moore Law Center. It's my pleasure to represent the plaintiffs' appellants in this case. And I intend to reserve five minutes for rebuttal. Now, this case is before this court on the district court's granting of the defendant's motion to dismiss for failure to state a claim under Rule 12b-6. Consequently, this court will review that decision de novo. And in its review, it must also accept as true the material allegations that are in the complaint and then all reasonable inferences that can be drawn from those allegations. Additionally, the complaint must be read in light that it's most favorable for the plaintiffs. Upon this court's de novo review of the facts of this case, I think it should be clear that the even-handed application of Establishment Clause principles to the facts of this particular case compel one conclusion, that the government's official resolution, a resolution passed by the Board of Supervisors that targets the Catholic Church because of its religious beliefs, violates the Establishment Clause of the United States Constitution. Now, the Constitution assures religious believers, Catholics included, that units of government, including the Board of Supervisors, the city and county of San Francisco, will not take positions that amount to essentially establishing a policy of condemning their particular religious beliefs. And that resolution that was officially passed does, in fact, do that. Breyer. Before you get too deeply into the argument that you want to make, could we just turn to the complaint for just a minute? Because there's one thing I found interesting in the way the complaint was drafted, which was the complaint does not attach the alleged offensive directive that the resolution was directed at. The directive by the, by Cardinal Levada. From the card. And my understanding of the directive was, I don't have actually what that particular directive is. One of the things that they point to is that there is an official document promulgated by the Congregation of the Doctrine of Faith with the Congregation of the Doctrine of the Faith, which was considered, which the judge referred to as the Considerations Doctrine. Now, that wasn't the directive. That's correct. Right. So that was about three years prior to the directive that's alleged in the complaint. Yes, sir. So that Considerations Document is essentially an official document of the church setting forth its religious beliefs and its positions on certain issues dealing with the Congregation of the Doctrine of Faith. But the resolution was prompted not by the Considerations Document. That is correct. But by this directive. Is that correct? That is correct. Now, that directive, though it's referred to in the complaint, and we could take the district court or us, we could properly look at it, is not contained in the record anything. My understanding, sir, is just it was just a directive from the Congregation of the Doctrine of Faith to Catholic Charities saying, look, you've got to comport with what the church's teachings are on. Do you think it's necessary? Do you think it's important that we know exactly what it said? No. Actually, I don't. Because if anything, that, again, if anything, is an internal document. And that's one of the problems I have with this resolution is that meddling with the affairs of the church is the Congregation of the Doctrine of Faith talking directly, speaking directly to a Catholic organization, Catholic Charities, and telling them, look, Catholic Charities, you've got to comport with what the church teaches on this particular issue. Was it directed to Catholic Charities or was it directed at the San Francisco archbishop? Well, it was the Catholic Charities falls within the diocese of San Francisco. And so the archbishop is obviously the one who's in charge of all the Catholic organizations. So, yes, the directive is because that's how that would be the proper hierarchy. You would go to whoever the senior Catholic leader is in that particular region, which is the archbishop. And so Cardinal Levada is the head of the Congregation of the Doctrine of Faith, made a directive to the archbishop to ensure that Catholic Charities, a Catholic organization, was in fact comporting with what the church is teaching. So the directive was directed to the archbishop here in San Francisco? Right, basically to the archbishop because Catholic Charities falls within the archdiocese. Does the archdiocese control Catholic Charities? They do. I mean, Catholic Charities is a Catholic organization. It's a Catholic social organization. Is it a separate 501C3? No, sorry. Honestly, I don't know the answer to that question. I'm not sure any of this matters because what you're complaining about is the resolution. That's right. The resolution urges the archbishop and the Catholic Charities to defy all discriminatory directives of Cardinal Levada. So it is directed at archbishop, whether rightly or wrongly, right? The resolution. The resolution. Yes, that's right. And I do think, and I'm trying to answer as best I can. But I think that's kind of tangential to the heart of this case and where the exact language of the directive that we don't have in here because I don't think it actually paramount to it. To me, I guess there are two interesting questions here. One is the American family case, if that's what it's called, seems to assume that  in that instance that it isn't. And then going on to other issues like the free exercise clause had said, but it's just a resolution. So I guess my question is, you know, what makes the resolution, let's assume the resolution was clearly, you know, there was no argument that it was secular in any way. Still, what makes it an establishment? Yeah. And I think the way the court distinguished it there, and I think correctly so, they made the point that even though it was nonbinding, because it's a nonbinding resolution, they said that may matter for free exercise purposes, but it doesn't matter for the establishment clause purposes. And I think that's one of the distinctions they made, and I think that's one of the points you're sort of driving at. But it is nonbinding in the same way that a nativity scene placed out during Christmas is nonbinding. It's an establishment clause violation in the same way that ten commandments have been taken off schoolroom walls. It's an establishment clause violation in the same way that a cross is being taken off of city seals. You're saying it's an official statement about religion, and that's what matters. That is what matters. And that's the point. Doesn't matter if there's any money spent on it? It doesn't matter. It probably is, but it doesn't matter. It doesn't matter. I mean, for standing purposes, if you want to look at it from, you know, whether it's taxpayer standing, I mean, that may be a different matter altogether. But in terms, it is a, you know, and I state it from the Board of Education v. Mergen, because I think this is a, you know, they say a crucial difference between government speech endorsing or disapproving religion, which the establishment prohibits, and private speech endorsing or approving religion, which the free speech and fair exercise clauses protect. There is a limitation on government speech, and that limitation, the courts have said, is the establishment clause. For the same reason where the government the law that prohibits the government from speaking an implied message, a message of endorsement or approval by putting out a nativity scene, for example, during Christmas, a national holiday, or putting up Ten Commandments in a classroom wall, the law that prohibits that action of the government is the same law that prohibits the government from speaking an express message of condemnation of religion. Right. So if Tom Ammiano or anybody else had gone out and had a press conference and said exactly this, there wouldn't be a problem. Well, I think there's a problem if they're speaking as private citizen, Tom Ammiano, and private citizen. Well, even, it would seem hard to me to say that Tom Ammiano, you know, is whoever he is. He's a combination of a private citizen who happens to be in a legislator, and it would seem hard to me to say that he can't go off and say whatever he wants. But this is an official document. It is. And I think there is, I mean, I think a reasonable observer, which is sort of the standard we have to look at, would see the distinction between these two things. We have a private citizen who has, who may make comments. And I think it's, I mean, this, I think here it's far more egregious. I think it's maybe questionable whether or not if he was representing himself as the mayor of the city and speaking on behalf of the city and making the sort of statements that were made in this resolution. I think that would get us closer to the Establishment Clause than, you know, him as a private citizen making statements. Because there is, the Establishment Clause is a restriction on the government speech. It depends on how he's, how he's speaking. So I think there is a distinction. But this is on the other side of the line in terms of government speech. We don't have to worry about the ‑‑ Right. But here you have an official resolution passed unanimously by the Board of Supervisors, signed off by the mayor. It's now an official, essentially an official policy statement of the city and county of San Francisco. All right. So then how do you distinguish this from the American family substantively? I think substantively, you know, it's very interesting because even the, I think the district court judge, and let me just back up. An American Family Association, when they reviewed the language that was at issue there, the court said that, you know, at best you could maybe infer that it was criticizing. But they found that it wasn't, that it was not a criticizing of the plaintiff's religion. And so if you look at the dissent, Judge Newman said, wait a second, this is a 12B6 motion. We've got to be able to infer those reasonable inferences from it. But leaving that aside, they said you cannot infer from that that it was a criticism of the plaintiff's religious beliefs. Obviously, the follow‑on to that is if it was, then it would violate the Establishment Clause. And I think American Family Association is very strong support for our argument in this particular case. Because even here, the district court judge, the district court judge said herself and found that, unlike the Government Act students in American Family, and this is, the excerpt to record page 242, she distinguished American Family Association, which the reason why they didn't find a violation, because they said it was not criticism of the plaintiff's underlying religious beliefs. That was the reason why it didn't violate the Establishment Clause. And here she says, and she acknowledges, that unlike the Government actions at issue in American Family Association, the language in Resolution 16806 can be interpreted as explicitly hostile toward the congregation's views regarding homosexuality and adoption by same‑sex couples. No inference is necessary to conclude that the resolution espouses opposition to a religious view as expressed in the considerations document. She made that finding. That finding alone, in light of the holding in American Family Association, requires a reversal of what her view is. She didn't make a finding. She was just reading the complaint in the light most favorable to the pleader. And that's what she has to do. But then for her to find to ‑‑ Well, you're not arguing that we're bound by her. You're arguing we should agree with her, essentially, that that is the case. I'm sorry. You're on our ‑‑ We're not bound by her view of the complaint, but you're just telling us that we should agree with her view of the complaint. I think that's ‑‑ I think when you look at ‑‑ that's the distinction. I mean, I think she acknowledges, and I think a reasonable ‑‑ a fair‑minded, reasonable, objective person looking at the language of that resolution and compared to what was at issue at American Family would find exactly how the judge found. But she made an error of law by saying, well, that finding alone isn't sufficient enough to have an establishment clause violation. Whereas American Family, I think, would have plainly said that finding would be sufficient to have a constitutional violation. In making this determination, we would be applying the Lemon test, would we not, the Supreme Court's case in Lemon? I would say, yes, sir. Yes, sir. Lemon as modified throughout all the cases that have since interpreted the Lemon test. Well, the principle three prongs of that, the first is the purpose. The purpose of that resolution, would you say the purpose of it was to criticize a particular religion? I absolutely think it would be. Or was it to encourage, not discourage, gay couples' ability to adopt children? I think the test asks whether the government's actual purpose. And I think here's a modification. When you look at the cases that have, because, you know, Lemon was decided a while ago and it's certainly been modified and criticized throughout the time. And it's been recently modified, specifically the purpose prong in the McCreary case. When you look at purpose now from the perspective of an objective, reasonable observer who considers first and foremost the text of the statute, in this case the legislation that's being challenged, legislative history and other matters. It's not about legislation. It's a resolution. It is considered legislation, though, I believe, Your Honor. Correctly, it was passed by the Board of Supervisors. A resolution? It's an official act by the legislature of the city and county of San Francisco. Well, it's a resolution. But it's not establishing any law or ordinance or anything like that. I understand that. But it is, obviously, it is an official act of the government. All right. It's an official act. Right. And all official acts can be subject. All official acts can be subject to constitutional scrutiny. The fact that it's a resolution does not, you know, immunize it from constitutional challenges. We obviously saw it in the American Family Association. But leaving that aside, I mean, putting out an attempt to see if it's an official act. Looking at the American Family Association, it seems to me that was the harder case for the finding there than this one is. That was more clearly a criticism of the religion than this is. I totally disagree with that. I mean, I don't think any reasonable-minded person would conclude that the resolution Well, I would like to think I'm a reasonable-minded person. But anyway, go ahead. Yes. Well, I mean, the standard obviously is an objective, reasonable person. Now, who that mythical person is, obviously it's the three judges that are sitting here at the bench. That's the way it works itself out in the law. Let's look at the second prong, the primary effect. Whether that was hostile to religion or the Catholic Church or was to protect same-sex adoption and denouncing discrimination. And again, sir, and I think this is a mistake that the judge made. When you look at the Lemon test, again, Lemon's been modified. The purpose, you look at it from the reasonable observer perspective. It's very, you know, some say, well, what is the primary, you know, there's gone Who modified it? The United States Supreme Court has. Okay. In what case? Well, Lynch v. Darnley, Taney v. Allegheny, Santa Fe case. And the effect of the modification is? The effect has been modified. It's been called the endorsement test is one way that they've been describing it. And this prong asks, irrespective of the government's actual purpose, they may have the best purpose in the entire world, and we can set that aside. But irrespective of the actual purpose, the question is, does this resolution in that issue convey a message of disapproval of religion? Would a reasonable observer. Religion or the opinion of the religious organization. It's from the perspective of an objective, reasonable observer. Yeah. Where they say this conveys a message of disapproval. And from Allegheny. But that's the key. Whether it's disapproving of the religion, that is the Catholic Church in this case, or disapproving of a viewpoint that the Catholic Church has. Right. And I think it's very plain that the challenge is to their religious – their viewpoint is their religious beliefs, their religious views. That is what the challenge is. But it's also called – to me, what's unusual about this is that it is calling – it is getting in the middle of the hierarchy of the church and saying that the archbishop should not obey the cardinal. It's essentially telling the church how to run itself, or one part of the church to defy the other part of the church, and to not follow the directives that were religiously based to begin with. And that seems to me to be quite different from what else there is out there. I think that's very problematic. And I think that goes to the point of an objective observer realizing they're trying to interfere in the basic religious practices and beliefs of a private institution, a religious institution. I mean, it's very remarkable to me that they would do that. They would seek to interfere. This case is unusual in that it's not an endorsement case. It's the opposite. Right? It's a case about disapproval rather than approval. Right. And there are very few of those cases. Yes, ma'am. And it seems to me that you would have to have a different – you wouldn't have an endorsement test. You'd have a non-endorsement test. I mean, I don't know what you'd call it, but it would have to have – I'm not entirely sure this isn't governed very productively by limit, really, because it's really more – it's always almost suing generous in a way. Well, if you look at this, if we're going to take the Supreme Court on its word that the Establishment Clause not only prohibits endorsement and promoting of religion, but it also prohibits disapproval and hostility towards religion. Right. So whether you want to – if you don't want to call it the endorsement test, you can apply the same standard and call it the disapproval test. Whether or not this conveys a message of disapproval to a reasonable, objective person, a disapproval of their religious beliefs or Catholics. And I think that's plain. And I think the inferences that you have to draw from this – from the complaint, especially at this standing, is ones that are in our favor. And there's one other language. If you look at the way it's modified, in Connie v. Allegheny, they said really the task is to determine whether the challenged governmental action is sufficiently likely to be perceived by the adherents or non-adherents, depending whether you're approval or disapproval, as a disapproval of their religion or their religious beliefs. And plainly, this meets that criteria. It should be the same exact tests that apply for the – and I know, Judge, it's interesting. Whether this is sui generis or should be a different test, but if you look at the language of these cases, they say it applies to both approval and disapproval, whether you're looking at Lynch, Allegheny, and so forth. To what extent does context play any role in this? Well, the – obviously, when the Court talks about the objective observer, it's within the particular context. Because, I mean, there's the rule they call pejoratively, you know, the reindeer rule. If you have a nativity scene with enough – Any objective person would look at the history of San Francisco, and when it comes to homosexual policies and issues, it's quite exceptional. Well, the thing, though, is the first thing you've got to look at – I mean, you know, that's noted by the district court in one of her footnotes. That's right. But one of the first things you've got to look at is the text. I mean, the context – I'm just asking about context. Right. Does context have any role here? Well, if this – I mean, here's – to me, at the end of the day, if you had – if policies, that's fine. But they didn't – they didn't do that. This was not a simple – a simple statement of neutral statement of her. And all agencies that have adoption should follow this policy. We advocate that. But didn't get directly into the question of the fact that there was a Catholic Church directive and that the cardinal should withdraw his directive and that the archbishop shouldn't follow what the cardinal said and so on. In other words, it seems to me that there obviously has to be enormous room for public policy that does not follow religion doctrines – is in conflict and clash with religious doctrine. And they can get up there and say, you know, we – our policy is X. And perhaps anybody – and we don't disagree with anybody who has a different policy. But that's different from getting into the middle of what the church is doing or has done. Right. I think that's – that is true. And you look at the language there. Well, you have a very wide berth, obviously, for – it can't be that – it's the problem is that the policy is in conflict with the church's policy. That can't be the problem. That's right. And I think there's – I mean, there's a lot of government policies that conflict with what church policy is. But you've got to look at the specific – this resolution itself and then ask the question, does this convey a message of disapproval? Does it treat Catholics as political outsiders? And it does. I mean, look at the language. Absolutely unacceptable. Hateful and discriminatory. Insulting and callous. Showing a level of insensitivity. Political outsiders isn't really the issue. It's more religious outsiders. Well, it's – I mean, establishment of religion is about making one religion or – either favored or disfavored. Well, favored and disfavored in what? We regard the favor and disfavor with regard to your status in the political community. That's the language from Ida Lynch v. Darnley and Connie of Allegheny and so forth. So they are considered outsiders because the city and county has taken an official position of disapproval of their particular religious beliefs. And that is problematic. And this resolution, I think, on its face conveys that message of disapproval of the Catholic religion and gets involved – Well, it has a more – look, when you read this, the way I read this, it has a much more narrow focus, which was the policy against same-sex couples adopting children. But it's directing, dealing with – You lump that all with it. It's a hostility towards the Catholic religion. It is on this particular view. Plainly, it is. Well, but the focus of this was the policy against allowing homosexual couples to adopt children. Okay, and if they want to make a neutral statement affirming the city's policy on that, it's not what they did. They're asking local church leaders to defy church authority. They're calling this position – They're saying Cardinal LeVader is decidedly unqualified. I mean, you look at the language. It's actually remarkable. I've never seen such a thing like this. And if we're going to say a simple nativity scene during Christmas has to come down, or a cross that represents the history of a city has to come down, how in the world does this satisfy the neutrality requirement of the Establishment Clause? It does not. And to not reverse, I think, would unfortunately establish a double standard under the Establishment Clause that has no place in our constitutional history. Do you want to say some time for rebuttal? I think I've already gotten over, sir, so I realize that's the case. If I could have some time for rebuttal. Yes, I'll allow you to have some time. Thank you. I want to be fair here. May it please the Court. Vince Chabria, Deputy City Attorney representing the City and County of San Francisco. I'd like to begin first by addressing the distinction that Judge Hugg focused on between disapproval of religion and disapproval of viewpoints. Then I'd like to turn to Judge Paez's concern about context. And finally, I'd like to address Judge Berzon's concern about the aspect of the resolution that focuses on the internal workings of the Vatican. So first, Judge Hugg, I think the distinction that you drew is critical, because the league's argument here is that this resolution, as I understand it, this resolution violates our Establishment Clause rights because the city has disagreed with our beliefs. Our religious belief that homosexuality is intrinsically disordered, our religious belief that same-sex couples are illegitimate, and our belief that allowing children to be raised by those couples would be violent. I know this is not in your schedule, but that to me is really not the crux of the matter. The crux of the matter is that they then went ahead and said that the Catholic church shouldn't have this belief. They should withdraw it. In other words, not simply our policy is different, but you should withdraw your belief and that the hierarchical church should not, the people lower down in the hierarchy shouldn't follow, the archbishop should not listen to what the cardinal told him to do. That seems quite extraordinary to me. Well, I would disagree slightly with Your Honor's characterization of the resolution, because I don't think that you should defy all discriminatory directives. Cardinal Levada should withdraw his discriminatory and defamatory directive, i.e., he should decide differently about what he believes is a religious issue, and that the archbishop should, if he doesn't, should defy him. Have you ever seen it like that? The aspect of Your Honor's characterization that I disagreed with was the suggestion that the city is urging the Catholic church to change its beliefs. But you're correct. He wanted to withdraw his discriminatory and defamatory directive. That sounds like they want him to change his beliefs. Well, the title of the resolution makes clear that the resolution is directed at changing a policy that is operating on the citizens of the city and county of San Francisco. And I agree with Your Honor that an urging towards a church official to do something and to defy a directive of a higher church official is different in kind from disagreement with a viewpoint expressed by a church official. I agree with that. And that's what bothers me enormously about it. But, again, under the Establishment Clause, the Court must analyze this in context. And context here, you have to remember that the city and county of San Francisco, its leaders and its citizens, had a serious stake in Cardinal Levada's directive to the archbishop, because... Catholic Charities is not getting it. It's got money from the city for other things, but not for adoptions, right? That's correct. So the city was not, didn't have any direct involvement in this, in how Catholic Charities was doing its adoption. Well, the city has a strong interest in ensuring that children who are in San Francisco were... Does the city do adoptions at all? Does the city itself involved in adoptions? My understanding, Your Honor, is that it's farmed out to agencies and that agencies receive grant money from the city. From the city for adoptions. Yes. But not to say a court did. Children who are in need of adoption are taken care of in part at the expense of the city's taxpayers. So this is, I think there are two different kinds of resolutions that would urge somebody in the church to disregard a directive from a higher up. You could imagine a resolution which has nothing to do, that is focused on something that takes place in the Vatican that has nothing to do with San Francisco. And that would be quite problematic if the city of San Francisco urged an inferior officer of the church to disregard a directive from a superior. But this is a situation where San Francisco, again, has a very serious stake in the matter. It has a stake in the well-being of the children who are being deprived of adoptive opportunities. It has a stake in the well-being of the people of the city and county of San Francisco, the gay and lesbian citizens of the city and county of San Francisco who are being told that they're disordered and not qualified to care for children. And it has a stake. Well, it's disordered and all that, which is, you know, thoroughly. I mean, I actually found the brief in this case somewhat disturbing as well because it continued to use that language unnecessarily. But the plaintiff's brief. But that is the religious idea. You see, I mean, insofar as you're talking about the directive, i.e. don't place these children, that's more colorful. Once you start getting into the question of whether they believe it's disordered and they believe that it's violent and they believe it's immoral and against their religion, then I think you are right in the middle of religion at that point. I disagree. I think that it's the distinction that Judge Hugg identified between disagreement with the religion or condemnation, trying to find a word that's the opposite of endorsement and maybe condemnation is the best word. It's the difference between condemnation of the religion and disagreement of a particular viewpoint that's expressed. One of the things that bothers me about that in the resolution, it seemed like it did go further than just arguing about the merits of gay people adopting a child, like this paragraph, whereas such hateful and discriminatory rhetoric is both insulting, callous, and shows a level of insensitivity and ignorance, which has seldom been encountered by this board. That's going further than just arguing about the viewpoint of whether gay people should be allowed to adopt children. I'm not sure about that. I would interpret that phrase, first of all, particularly in the context of the resolution overall and in the context of what the board is responding to that the church said as a particular Which we don't seem to know what the rhetoric of the church was. Nobody's included that. We do know what the church said in 2003, and we know the nature of the rhetoric. And, in fact, that's what's being commented on in that language that Judge Hyde just read. That's correct. It's in the preceding paragraph, and it is from the Vatican. It's from Toronto, Nevada. It was in the context of statements about religious doctrine. This is clearly calling Catholic religious doctrine ignorant. Now, it's one thing to say it seems gratuitous, for one thing, and it seems to have no stopping point. What really troubles me is, I mean, suppose the city of San Francisco passed a resolution a week saying that the notion of Jewish people that they ought not to eat pork is ignorant and ridiculous and all Jewish people should defy the tenets of their religion and eat pork all the time because we have to sell a lot of pork in our city. I'm making this up, but, you know, we have a secular purpose, which is we need to sell pork. And not only that, to not shop on Saturdays is really terrible because you're getting in the way of the economics of the city. And not only that, but for the other people to go to church on Sunday is a terrible thing because then you're not shopping on Sunday. And not only that, you know, we can have one a week of these. And isn't that exactly what the Establishment Clause is supposed to prevent? Well, I think that that, obviously, that resolution or that series of weekly resolutions presents a difficult problem. I think, though, if, for example, let me take a slightly less extreme version of your hypothetical resolution. What if the Board of Supervisors enacted a resolution that said, We disagree with the manner of kosher slaughter. I'm sorry, I didn't hear that. Kosher slaughter, kosher animal slaughter. And we believe that there are more humane ways to slaughter animals. And we urge those who engage. We urge members of the Jewish community. And not only that, but we urge Rabbi So-and-So to not follow what Rabbi So-and-So said, even though he's the head of the Orthodox synagogues. Don't listen to Rabbi So-and-So. I mean, this is really extraordinary in many ways. Well, because it has two features. One is a direct attack on the doctrine. And the other is a direct attack on the hierarchical structure of the church and a request that it be defied and not followed. I don't think in an Establishment Clause case the court should be in the business of making a judgment about how central to the doctrine a particular religious viewpoint is. I think that's dangerous. I think the ---- I wasn't trying to do that. I was saying this was a direct attack on material that was set out as a doctrine. It is a ---- what's the name of the thing that was ---- it was a direct attack on a document that purported to be a religion, a doctrine of a ---- a document about religious faith and practice. And I ---- One. And two, it is a direct attack on the hierarchical structure of the church and a request that it not be followed. And I think that ---- I want to deal with the second aspect of Your Honor's question separately, but on the first aspect, direct attack on an aspect of the doctrine. I actually think that only begs the Establishment Clause question. That does not answer the Establishment Clause question, because you have to ask why is the government official or government entity criticizing this idea, whether it happens to be expressed ---- Well, they could have said that. They could have said, you know, you say X and we disagree, we think Y. But it's another thing to say that you're insensitive and ignorant for saying that. Well, that's an issue of whether the board is denouncing a particular idea strongly or lightly, rudely or politely, and we can have a discussion about whether the board used appropriate manners. But I don't think that's relevant to the Establishment Clause issue. The Establishment Clause issue is, is the board doing this because of the Speaker's religion? Well, they used to have, you know, in Muslim, in the Inquisition in Spain, they would have these debates between people of different religions because they were trying to figure out the truth. When you say that somebody is ignorant in stating what his religious belief is, you're saying, you know, we are declaring it isn't true. That's different from saying that we think something else. Well, I think certainly the board is declaring that Cardinal Levada's statements about homosexuality and same-sex couples are not true. There's no doubt that the board is doing that. But they're also saying essentially, and your religious belief that it is true is ignorant and we're declaring it to be essentially wrong, and disapproving of it. And what are they doing other than disapproving of their religion? That's what they're doing. Well, you know, another paragraph that bothers me is the last one resolved, that the Board of Supervisors urges Cardinal William Levada in his capacity as head of the Congregation of the Doctrine of Faith at the Vatican, then in paragraph formerly known as the Holy Office of Inquisition, that is thrown in there as quite prejudicial, I think, to withdraw his discriminatory and defamatory directive. We don't know whether it's defamatory or not because we don't know what it said. But as discriminatory and defamatory directive, that the Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households. Now, the thing that bothers me is just it's going further than arguing just about whether homosexual couples should be able to adopt children. But it seems to be a pretty strong criticism of the Catholic Church Office of Inquisition. Well, I would agree with what I think is the thrust of Your Honor's question, which is that parenthetical was not necessary. It seems as if it was probably an effort to say, look, this is the same type of thing happening again under a different name. But it wasn't necessary. And I think that the best way to understand that is to say happening again. Again from what? Meaning to say that what's going on now, this treatment of homosexuals is similar to some of the conduct of the Office of the Holy Inquisition, the Holy Office of the Inquisition in the past. And that was unnecessary. And I think I would concede to Your Honor that it was a jab at the messenger in an attempt to undercut the message. And there are a couple different places in the resolution  I think you have to get back to the Establishment Clause test, the Lemon Test, which is what was the primary purpose of this resolution and what was the primary effect of it? Was it to condemn religion? Or was it to condemn discrimination against gay men and lesbians and to protect the citizens of San Francisco from the directive that San Francisco's leaders believe harm the people of San Francisco? And I think to answer that question you have to ask the following hypothetical. I mean imagine that this debate didn't occur between the Board and the Vatican, but instead between the Board and a major influential secular organization that's involved in charitable activities around the world, say the Bill and Melinda Gates Foundation. And let's say Bill and Melinda Gates pronounced from Seattle that same-sex couples in San Francisco are illegitimate and intrinsically disordered and as a result should not be the beneficiaries of the charitable work that our organization does. Does anybody doubt for a moment that the Board would not have denounced that viewpoint of Bill and Melinda Gates in equally strong terms as it denounced the viewpoint expressed by the Vatican and the directive by the Vatican? And that really, I think, should be dispositive of the Establishment Clause inquiry. The other point I want to make is that I think there's something – there's been something missing from the First Amendment equation here as we've been discussing this issue, and that's the right of government officials to represent and protect the interests of their citizens. And under the League's interpretation of the First Amendment, government officials can criticize the position expressed by Bill and Melinda Gates, but they can't criticize in the same terms the very same position expressed by an organization if it happens to be religious. And that's not how the marketplace of ideas works because the case law is very clear that the government is a very meaningful participant in the marketplace of ideas. And if I could just quote a couple of cases from the U.S. Supreme Court on that point. First, in Bond v. Floyd, 385 U.S. at 136, the Court stated, the manifest function of the – Isn't the whole point of the Establishment Clause that that isn't true with regard to religion? That's why you can't have a Christmas tree and you can't have a creche and you can't have the Ten Commandments? It's certainly true that – Is that put out by the government? The point I was making by citing these cases is not that the Establishment Clause doesn't limit the government's ability to speak. Clearly, it does. But the point is that when we have a situation, as we have here, where the interests of the people of San Francisco are affected, San Francisco's elected leaders have the right to respond to statements and actions that will affect their constituents. And so, if I may, what the Court says is – So what about all my hypotheticals? I mean, they were a little silly, but they weren't that silly. You know, if a lot of Jewish people don't shop on Saturdays, we're going to have economic problems, and we're going to say that next. If the resolution was limited to that – So, therefore, all Jewish people should not follow their religion, and the rabbis should stop saying this stuff, and not only that, but it's ignorant and stupid to think that you shouldn't shop on Saturdays. Well, I think that you would have to ask, what is San Francisco's stake in that? I just told him what his stake is, that stores aren't doing too well on Saturdays. I mean, there are towns – my father lives in one – where the whole place is closed down on Saturday. It annoys the hell out of him. All right? You know, he would love somebody to go out and say, this is terrible. Stores should be open on Saturdays for people who want to go to them. And the only way that's going to happen is if people don't follow their religion and shop on Saturdays, and if the rabbis who are saying otherwise should stop saying that and defy their religion and their understanding of their – of the Bible. I think, as Your Honor just worded it, that would be a violation of the Establishment Clause. But that's what this says. No. Because in Establishment Clause cases, the court has to consider the context. And the context here is that the Vatican made particular statements about same-sex couples. The Vatican issued a particular directive about how – about adoptive children in San Francisco. Based on another document that was – that explained that this was all the religiously-based notion. I mean, you may all think it's terrible. I mean, but that's what they thought. That's what they said. They said this comes out of our religious understanding. It wasn't gratuitous or disconnected. But the government is not silenced and the government is not precluded from proclaiming that a belief expressed by a religious organization is terrible. Neither, by the way, is the government precluded from expressing a – from praising a belief expressed by a religious organization that it agrees with. I mean, under the – under the League's interpretation, if religious leaders announce that the government should be doing more to help the homeless, government officials can't respond by praising it. They can respond by saying we don't intend to help the homeless and we have reasons for not helping the homeless and you're – and we disagree with you about helping the homeless, but they can't say you're ignorant and stupid and not only that, you shouldn't think that we should help. You should stop thinking that and you should stop doing anything in pursuit of your beliefs. And that's what they're doing here. They're not saying we're going to do what we do. You do what you want. They're saying you don't do what you want. You do something else. I think that the government officials in that example could say you're ignorant and stupid for insisting that we spend more money. And don't follow your own religion. Go do something else. I think – And don't even listen to your superiors who tell you to do this. I think if they – if they explicitly said don't go and follow your own religion That's not what they're saying here. That's exactly what they're saying here. No, what – it's very clear from the context of this document that it is only about homosexuality and child adoption. It is not about the Catholic religion. But the Catholic religion thinks it's about the Catholic religion. They have a directive. They have – they had an encyclical or they put out the Vatican saying it was about the Catholic religion. And that's the problem. That, Your Honor, has just hit on the problem. The Catholic religion thinks it's about the Catholic religion. And the consequence of ruling in favor of La Ligue is that whenever a speaker cloaks his policy views in his religion, all of a sudden the government leaders cannot denounce it. If an extremist religious group announces that America is the enemy of God, President Bush, in his State of the Union address, cannot denounce that position. That's not how the First Amendment works. And it's not for the court to inquire about how strong or how legitimate the belief is of the speaker who is – the religious belief of the speaker who is expressing the idea. What you have to look at is the government's purpose behind its speech and the effect of the government's speech. And it's clear in this case the purpose and effect of the speech is not to condemn the Catholic religion but to condemn the discrimination against gay men and lesbians and to condemn this policy on adoption. And that, Your Honor, has really focused on the problem, is that we have to look at it from the perspective of the government who is doing the speaking. And in this case, it's quite clear, to follow up on Judge Pyle's point – I thought what we're supposed to be doing is looking at it from the point of view of an objective observer. Pardon me? I thought we're supposed to be looking at it from the point of view of an objective observer. We are. And the objective observer has to ask, given the history and the context, was the government's purpose to denounce or condemn religion? Would a reasonable observer under the effect test – and I would submit that under McCreary the purpose and effect tests have sort of been conflated – but would a reasonable observer conclude that the government is endorsing or condemning religion? And in this case, from this resolution, the reasonable observer would conclude, viewing it in a light most favorable to the plaintiffs, that although the government is taking some jabs at the messenger in an effort to undercut the message, the primary purpose and the primary effect of this resolution is to denounce discrimination against gay men and lesbians and to protect children in San Francisco, protect their right to be placed for adoption with same-sex couples. You're way over. Thank you, Your Honor. Thank you. Thank you. A couple of points of rebuttal. With regard to – and I agree, Justice Rosen, this is really an extraordinary measurement. I think your examples of the Jewish example is really right on. One of the cases that I direct this Court's attention to, the defendant's key point is, well, you've got to look at what the – what our actual purpose is. Well, regardless of what the actual purpose is, I mean, you could even – irrespective of purpose, what message does it convey to the adherence of a religion? What would an objective observer, looking at this, consider the message to be conveyed? In this case of Church of Lukumi-Babalui v. City of Hialeah – Are we looking for the major purpose? I'm sorry, sir? Are we looking for the major purpose, or just there could have had some purpose, being all criticism of the church? You look at some – and I think it was Lynch v. Donnelly, they referred to it as, what is the actual purpose? Meaning, you don't just accept the self-serving statements of the government, but you look at what actually was done and what was the actual purpose. And that City of Hialeah case where they banned – you know, the ritual sacrifice instead of what the purpose was for, you know, for health reasons. If they wanted to pass a law that prohibited, you know, the killing of chickens for health reasons, they could have done that, but they did it specifically to target that particular religion. So you've got to look at what the actual purpose was. But then irrespective of the purpose, what is the effect? And the effect is the message that's conveyed to the adherence, in this case, of the Catholics, and what would an objective observer, looking at the – when you look at the context. But the context starts with the text, and you need not go any further from the text, and particularly in the posture of this case before this Court now in 12b-6, all those inferences, all those reasonable inferences, those ones that Judge Berzon was citing too, are ones that you have to construe in our favor. Plainly we stated a claim under the Establishment Clause. Let me ask you one question. Yes, sir. We don't have the directive, but we do have the considerations. Just so I understand the role of the considerations within the Catholic faith. What is their status? That is a specific promulgation of the faith of the Church. The Congregation for the Doctrine of the Faith, that's a very significant position. Then-Cardinal Ratzinger was the head of the Congregation for the Doctrine of the Faith. He's now Pope Benedict. I mean, it's one of the most senior positions, one of the most important positions. Their role and their job is to safeguard the teachings of the Church throughout the entire Catholic world, and they will issue directives on matters that address, that go to the heart of the religious beliefs of the faithful. That considerations doctrine is one of those doctrines. So this was the considerations regarding proposals to give legal recognition to unions between homosexual persons. That is correct. That is an official, universal, consistent moral teaching of the Church. It's a very significant document in the view of the Church. And in light of that document, Cardinal Levada said what's going on in the Archdiocese of San Francisco is contrary to the fundamental teachings of the Church, and so he gave a directive to Cardinal, the Archbishop, to follow the teachings of the Church with regard to the Church. And that's the thing. The Catholic Church can't tell any of these other agencies not to adopt. They can't tell the city of San Francisco to change a policy. The city does whatever it wants to do. This was a directive to a Catholic organization to adhere to the Catholic faith and then receiving the condemnation of the city on account of that, and then calling on Church leaders to defy the Church. But you took those two features out. Suppose they didn't – this thing – and you also took out anything that could be regarded as condemnatory rhetoric as such, I mean, or a strong rhetoric like ignorance and the Inquisition. Suppose you just had a resolution that said the Catholic – there's a directive from the Catholic Church to Catholic charities to not place children with gay couples. It is the policy of the city of San Francisco that children should be placed with gay couples. We hope that the Church will reconsider its views, period. I mean, something that was respectful and didn't call for defying the Church and stated the city's affirmative policy and stopped there. And I think that's close to the American Family Association, although I kind of agree more with Judge Noonan in the dissent in that case. But certainly if you make a statement of neutrality towards a particular policy, I don't see a problem. That's why when you talk about the marketplace of ideas – Well, it would be a disagreement with it, but I was trying to convey something that neither had the feature of requesting defiance nor of condemnation in a strong sense as opposed to disagreement. Well, I mean, taking your Jewish example and sort of watering it down and saying that the city passed a specific resolution saying that we don't think that Jewish – persons of the Jewish faith should refrain from eating pork because it's hurting our economy. I think that's a problem, too. That's closer to the line, but I think that's a problem, too. Because you specifically address – I mean, if the point – again, if you can't have a nativity scene out, how can you have something like this? And if it's going right to the heart of a religious doctrine, I think it's a problem. But using that example – but again, I don't think that's the context we have here. I think, as you pointed out, especially the inferences that can be drawn from that – from the language of this resolution, a very strong condemning of religious beliefs and religious leaders and calling on defiance of the religious Church. One thing that would help me – the Catholic charities that are involved in the adoption process, do they receive any funds from the city or elsewhere? Well, they have contracts with the city, and I think those are some of the documents that were in the judicial notice. Not a part of it. My understanding is it's not for adoption. Clearly, the city could say we're not going to pay you – not going to pay you Catholic charities to do our adoptions because we disagree with the way you're doing adoptions.  There's no doubt about that. That's absolutely right. I don't see there's a problem. There's a lot of faith-based organizations that do a lot of contracting with the cities, and they provide a lot of social services. And the city can insist that they follow city policies in doing that. If they won't place children with gay couples, no money. You can't do it. That's right. And if that religious organization believes that whatever the city policy that they're trying to impose and then violates a religious belief, then it's the prerogative of that religious organization to say you can't be doing those practices anymore. We've been very generous. Yes, sir. Thank you. Appreciate it. Thank you. We appreciate your arguments. The matter is submitted.
judges: Hug, Paez, Berzon